**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MOLLY VICK,**

       **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　　　　　**Civil Action No. 3:24cv00211**

**TRANS UNION, LLC,**
SERVE:   Corporation Service Company Reg. Agent
             100 Shockoe Slip
             2nd Floor
             Richmond, VA 23219

**EQUIFAX INFORMATION SERVICES, LLC,**
SERVE:   Corporation Service Company, Reg. Agent
             100 Shockoe Slip
             2nd Floor
             Richmond, VA 23219

**EXPERIAN INFORMATION SOLUTIONS, INC.,**
SERVE:   CT Corporation System
             4701 Cox Rd,
             Ste. 285
             Glen Allen, VA 23060

**and**

**VERIZON COMMUNICATIONS INC.,**
SERVE:   CT Corporation System
             4701 Cox Rd.
             Ste. 285
             Glen Allen, VA 23060

       **Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Molly Vick, by counsel, and for her Complaint against Defendants Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Verizon Communications Inc. ("Verizon"), she states as follows:

### PRELIMINARY STATEMENT

1.     This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.     Trans Union, Equifax, and Experian are the USA's major consumer reporting agencies (hereinafter, these three are collectively referred to as the "CRAs" or "CRA Defendants").

3.     The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete the information. 15 U.S.C. § 1681i.

4.     The FCRA's accuracy provisions demand that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Verizon, particularly when a consumer makes a dispute about information reported.

5.     Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity is Verizon (the "Furnisher"). The FCRA demands that each party separately conduct a reasonable

2

investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      Plaintiff brings claims under Section 1681e(b) against Trans Union, Equifax, and Experian because each reported inaccurate account information about Plaintiff regarding an inaccurate and derogatory Verizon account. When Plaintiff disputed the inaccuracies, Trans Union, Equifax, and Experian did not reasonably investigate, also violating Section 1681i.

7.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Trans Union, Equifax, and Experian have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Trans Union, Equifax, and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

8.      Likewise, Verizon violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Verizon did was consult its own records about the wrongful account and confirm to the agencies the inaccurate information it was already reporting. Verizon failed to correct the inaccurate and derogatory reporting on Plaintiff's credit reports despite receiving ample notice, and despite previously acknowledging the inaccuracy of the information that it was reporting.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

10.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). A substantial portion of the events giving rise to the claim occurred in this District and Division.

## PARTIES

11.     Plaintiff is a natural person, and a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, Virginia.

13.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

15.     Equifax is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, Virginia.

16.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

18.     Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, Virginia.

19.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.     Experian disburses consumer reports to third parties under contract for monetary compensation.

21.     Verizon Communications Inc. is a Stock Corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, Virginia.

22.     Verizon is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

23.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v.*

*Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

24.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

25.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

26.     Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D.

Va. Mar. 18, 2011).

27.     Section 1681i(a), on the other hand requires much more from a CRA after a

consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly…of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

28.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate

and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin*

*v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term

'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching

inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations

omitted).

29.     It has long been the law that a CRA, such as Trans Union, Equifax, or Experian,

does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by

merely contacting the creditor who supplied the dispute item.  *See, e.g., Pinner v. Schmidt,* 805

F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to

contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at \*9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

30.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

31.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); *see* Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

32.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

33.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

### *Section 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as Verizon to Perform a Detailed and Systematic Investigation of Consumer Disputes*

34.    Today, furnishers such as Verizon have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

35.    Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs.

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

36.     Additionally, Verizon has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether the consumer disputes such reporting. *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### *Plaintiff Becomes a Verizon Customer Not Knowing the Trouble it Will Cause*

37.     In or around December 31, 2021, Plaintiff decided to transfer to Verizon cellular service for herself and several family members. As part of the transfer, Plaintiff purchased four new phones.

38.     Due to her permanent and severe disabilities, including being predominantly confined to her home, Plaintiff explicitly requested that a Verizon representative arrange for three of the newly-purchased phones to be directly delivered to the residences of the family members for whom the phones were purchased. The Verizon representative assured Plaintiff that they would be.

39.     In early January 2022, contrary to Plaintiff's instructions, Verizon delivered three phones to Plaintiff's own address instead of the specified recipients' addresses. Concerned by this error, Plaintiff promptly contacted Verizon to report the mistake.

40.     In response, Verizon proposed that Plaintiff herself should mail the phones to the correct addresses. Verizon's "solution" completely disregarded Plaintiff's disability, which

Plaintiff had already explained to Verizon. Despite Plaintiff reiterating her circumstances, Verizon maintained it was Plaintiff's responsibility to send the phones to the correct addresses. However, Verizon offered to issue statement credits to Plaintiff as a "gesture of goodwill" for the inconvenience Verizon caused.

41.    To facilitate the issuance of the promised statement credits to Plaintiff, Verizon established and assigned Plaintiff the account number 0226309850 ("9850").

42.    Approximately ten days after Plaintiff mailed the phones to their proper recipients, the devices were ready to be activated. Plaintiff initially tried to activate them using Verizon's self-guided process without success. Subsequently, she contacted Verizon, reported the activation issues, and received further instructions. Despite following these directions, the attempts were unsuccessful, leaving Plaintiff without cell service for 24 hours. The situation was exacerbated by the geographic separation of the phones and repeated disruptions in communication with Verizon, including the loss of service during activation attempts.

43.    Due to continued difficulties in activating the phones, Verizon created a new account for Plaintiff, designated with the number 0626321100 ("1100"). Following this adjustment, the phones were successfully linked to this new account and activated.

44.    On or around January 29, 2022, Plaintiff received her first bill for account 1100 for $175.06.

45.    Upon reviewing her bill, Plaintiff noticed that the statement credits Verizon had promised were missing. Through several conversations with Verizon, Plaintiff learned that Verizon had incorrectly applied the credits to account number 9850, instead of her correct account, 1100. Plaintiff also discovered that Verizon had never cleared the charges that it initially applied to account 9850.

46.     Verizon had left the 9850 account open, even though Plaintiff had never used that account.

47.     Verizon should have closed the 9850 account as soon as Verizon opened the 1100 account and began applying charges to the 1100 account.

48.     All charges associated with the 9850 account were inaccurate, and Plaintiff never owed Verizon for any of the charges that it assessed against the 9850 account.

49.     After dedicating over 25 hours in January and much of February attempting to resolve her account issues and ensure her phones were functioning correctly, Plaintiff contacted Verizon on or around February 17, 2022. She informed Verizon that charges were incorrectly being assessed against her from account 9850.

50.     During the conversation on February 17, 2022, Plaintiff spoke with a Verizon agent named Ery through Verizon's "chat" feature. Plaintiff detailed the issues related to the incorrect application of charges to account number 9850. Upon reviewing Plaintiff's concerns, Ery agreed that the charges applied to the 9850 account were incorrect and acknowledged that Plaintiff never used the account.

51.     Ery told Plaintiff that she would remove the charges on the 9850 account. Plaintiff then asked whether the account would be closed. Ery assured her, stating, "Yes. It should be since there's [sic] no active lines on this account."

52.     Plaintiff asked Ery whether Plaintiff "would be able to see somewhere that the account has zero balance and has been closed." Ery then said, "It should be deactivated instead of close[d]. It will remain but you won't be charged for it. Since there are no active lines on your first account."

53.     Plaintiff asked Ery how they could be sure that the account wouldn't be charged again the next month. Ery told Plaintiff, "I can assure you that you won't be charged for this account moving forward."

54.     Towards the end of the conversation, Plaintiff asked, "OK – so no charges going forward for or related to account 0226309850 . . . To me or anyone/line on my account 0626321100[?]" Ery confirmed, "You are absolutely correct for this one."

55.     Two days following Plaintiff's conversation with Verizon agent Ery, she received an "urgent activation reminder" email from Verizon dated February 19, 2022. This email was related to the purportedly "deactivated" account 9850.

56.     Plaintiff again called Verizon to notify it of the email that she received. The Verizon agent again assured her that it resolved the issue, and that Plaintiff could disregard the email.

57.     Plaintiff continued to timely pay her Verizon bill for account 1100.

58.     In or around May 2022, Plaintiff received an email from Verizon that her service had been terminated due to an unpaid balance of $2,443.39 on account 9850. The related bill listed the total amount due as $2,443.39 for April 1 to April 29, 2022. The bill also referenced a previous balance of 10 cents from March 2022.

59.     Over the following week, Plaintiff repeatedly contacted Verizon regarding her account issues. During these communications, Verizon representatives told Plaintiff that a service ticket had been created to address her concerns. They confirmed that detailed notes were taken to document the recurring problem, they assured her that the account discrepancies would be corrected, and they promised her that the account would not be sent to collections.

60.     Plaintiff was shocked when she received a May 20, 2022 dunning letter[2] from Convergent Collections Agency ("Convergent") seeking to collect on the debt from the 9850 account.

61.     Throughout June 2022, Plaintiff had numerous calls with Verizon and Convergent representatives trying to resolve their mistakes.

62.     On or about July 5, 2022, Plaintiff spoke with Verizon representative Marlon. Marlon informed Plaintiff that he had rectified the situation and changed the account to a zero balance.  Plaintiff then asked for and received an email from Verizon that said, "customer account MOLLY VICK 0226309850 balance due summary Balance due 0.00 past due balance 0.00 current 0.00 30 days 0.00 60 days 0.00 90 days 0.00 120+ days 0.00 adjustments 0.00 invoice date 07/01/2022 due date 07/24/2022."

63.     The next month, Verizon sent Plaintiff another bill attempting to collect $2,443.39 for the 9850 account. Again, Plaintiff called Verizon, and Verizon failed to fix their mistake.

64.     On or around October 6, 2022, Plaintiff received a call from a second collection agency, MRS Associates, attempting to collect on the wrongful debt. Plaintiff again contacted Verizon, which acknowledged the mistake but failed to resolve the issue. She later received a January 6, 2023 dunning letter from McCarthy, Burgess & Wolff, Inc., a collection agency.

65.     In or around November and December 2022, Plaintiff disputed the 9850 account and associated charges by sending detailed disputes directly to Verizon and MRS Associates, and in February of 2023, she disputed directly to McCarthy, Burgess & Wolff, Inc.

---

[2]     A "dunning letter" is a letter demanding payment of a debt--*i.e.*, a collection notice. *DeCapri v. Law Offices of Shapiro Brown & Alt, LLP*, 2014 U.S. Dist. Lexis 131979, *1, n.1, 2014 WL 4699591, *1, n,1 (E.D. Va. September 19, 2014); *Fariasantos v. Rosenberg & Associates, LLC*, 2 F. Supp. 3d 813, 816 (E.D. Va. 2014); *Bicking v. Law Offices of Rubenstein and Cogan*, 783 F. Supp. 2d 841, 842, n.1 (E.D. Va. 2011).

66.     Neither Verizon, MRS Associates nor McCarthy, Burgess & Wolff, Inc. resolved their incorrect billing in response to Plaintiff's disputes.

### Plaintiff Discovers the CRA Defendants were Reporting the Wrongful Verizon Debt and Disputes Those Inaccuracies

67.     In or around January 2023, Plaintiff discovered that her Fair Isaac Corporation ("FICO") score dropped nearly 145 points in October 2022 due to the wrongfully reported Verizon Account.

68.     Plaintiff subsequently disputed the account information with Experian.

69.     On or around February 4, 2023, Plaintiff received an email from Experian containing her dispute results. Experian's response *confirmed* the accuracy of the wrongful 9850 account and indicated that the account information had been updated accordingly.

70.     On or around February 17, 2023, Plaintiff sent an email to Verizon customer service disputing the debt.

71.     In April 2023, Plaintiff obtained her consumer report(s) from Equifax, Trans Union, and Experian. Each report included the disputed Verizon account and indicated that the account had been sent to collections.

72.     On or around May 25, 2023, Plaintiff disputed the inaccurate and derogatory Verizon account with Verizon and each of the CRA Defendants. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested. The dispute letter included her Social Security number and a copy of a July 2022 email from Verizon (which evidenced a zero balance on the contested account).

73.     On or around June 1, 2023, Trans Union notified Plaintiff that it had reviewed the dispute, but it would not process the request. Instead, Trans Union requested that Plaintiff visit its website to confirm her identity and dispute the information there.

74.     On or around June 6, 2023, Experian notified Plaintiff that it had "received a request regarding you credit information that does not appear to have been sent directly by you."

75.     On or around June 14, 2023, Equifax notified Plaintiff that it had "verified" the 9850 Verizon account as accurate.

76.     On or around July 6, 2023, Plaintiff once again disputed the inaccurate and derogatory reporting of the Verizon account to both Experian and Trans Union. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested, and enclosed copies of her driver's license and a utility bill for additional identification verification.

77.     On or around August 3, 2023, Experian notified Plaintiff that the inaccurate and derogatory Verizon account was "verified" as accurate.

78.     On or around August 5, 2023, Trans Union notified Plaintiff that the inaccurate and derogatory Verizon account was "verified" as accurate.

79.     Upon information and belief, all three CRA Defendants are still reporting the fraudulent Verizon account on Plaintiff's credit files.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

80.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Trans Union, Equifax, and Experian to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

81.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[3]

82.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication.  That mailbox company receives consumer disputes and scans them into a batch with other disputes.

83.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

84.     Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

85.     Teleperformance agents and Experian Chile agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

86.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

---

[3] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

87.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian.  It gets sent to the Defendant CRAs' creditor customers (such as Verizon) for their sole review and consideration.

88.     Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax."  *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

89.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

90.     Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage, or reliably influence the employees of their respective third-party outsource vendors.

91.     Trans Union, Equifax, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Verizon, Who Did Nothing

92.     In each instance in which Plaintiff disputed the Verizon account with the CRAs, the CRAs forwarded Plaintiff's disputes to Verizon using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results back to CRAs.

93.     On information and belief, e-Oscar is also the system by which Verizon has agreed it will accept consumer disputes from the CRAs.

94.     Each instance in which Verizon received one of Plaintiff's disputes from a CRA, Verizon became obligated under the FCRA to investigate that dispute.

95.     Plaintiff's disputes to Verizon to attempt to have it reinvestigate Plaintiff's complaints went unanswered, as Verizon continues to report the inaccurate and derogatory account to the CRAs.

96.     Verizon failed to reinvestigate Plaintiff's complaints.

97.     Despite Plaintiff's diligent efforts to use the legal means that are available to her to report the erroneous information, Verizon continued (and continues still) to report the account— which does not belong to Plaintiff—as accurate to the CRAs. Discovery will show that all Verizon did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal reporting records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

98.     On dates better known to Trans Union and Verizon, Trans Union furnished Plaintiff's disputes to Verizon.

99.     On dates better known to Equifax and Verizon, Equifax furnished Plaintiff's disputes to Verizon.

100.    On dates better known to Experian and Verizon, Experian furnished Plaintiff's disputes to Verizon.

101.    In violation of § 1681s-2(b)(1)(A) of the FCRA, Verizon failed to reasonably reinvestigate Plaintiff's disputes that Verizon received from Trans Union, Equifax, and Experian.

102.    Verizon further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to correct, delete, or permanently block the account after receiving Plaintiff's disputes from Trans Union, Equifax, and Experian.

103.    The Defendant CRAs responded to Plaintiff's disputes, claiming the reported information was verified as accurate and the information was updated. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to Verizon.

104.    Upon information and belief, CRA Defendants timely notified Verizon of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

105.    Upon information and belief, Verizon received timely notice of Plaintiff's disputes from Trans Union, Equifax, and Experian, and the supporting documents submitted with Plaintiff's disputes.

106.    By its actions as described herein, Verizon furnished and communicated false credit information regarding Plaintiff.

***Plaintiff Suffered Actual Harm***

107.    Trans Union, Equifax, and Experian continued to report the derogatory Verizon account on Plaintiff's credit reports even after being notified that this information is false. Upon information and belief, Trans Union, Equifax, and Experian are *still* reporting the inaccurate Verizon account on Plaintiff's credit.

108.    Plaintiff attempted to resolve these matters with Defendants and her credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

109.    As a result of the inaccurate reporting and failures to properly respond to Plaintiff's disputes, Plaintiff has suffered damages, including, but not limited to:

    a.  Harm to credit opportunities;

    b.  Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

    c.  Loss of time attempting to correct the inaccuracies;

    d.  Stress associated with attempting to resolve this matter; and

    e.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

***Defendants' Conduct was Willful***

110.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co.*

*of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

111.   Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

112.   As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

113.   The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

114.   Just in federal court alone, during the past decade, Verizon has had to defend approximately 528 consumer credit lawsuits.

115.   In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

116.   CRA Defendants knew or should have known of this litigation history.

117.   CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

118.   The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many

multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

119.    Each Defendant regularly receives unredacted consumer dispute details from this database.

120.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

121.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

122.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

123.    Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union, and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

124.    Just in the last 12 months alone, Trans Union, Equifax, and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

125.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

126.     Trans Union, Equifax, and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

127.     Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit*

*Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

128.    Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

129.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

130.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[4]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

131.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to

---

[4] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Release/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

132.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[5]

133.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

134.    Among many of Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

---

[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

135.    Proportionately similar, Verizon has also been sued in federal court repeatedly for consumer credit claims by consumers – most involving alleged violations of the FCRA.

136.    Verizon was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

137.    Verizon was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

138.    Verizon was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

139.    Verizon was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

140. Verizon was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

141. Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

142. Defendants' procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
### *against Trans Union, Equifax, and Experian*

143. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

144. Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Verizon.

145. As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability,

humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

146.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Trans Union, Equifax, and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

147.    Trans Union, Equifax, and Experian each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

148.    The violations by Trans Union, Equifax, and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union, Equifax, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

149.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union, Equifax, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
***against Trans Union, Equifax, and Experian***

150.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

151.     Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff' credit files.

152.     Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(2) by conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they each received with Plaintiff's disputes.

153.     Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Verizon account.

154.     Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

155.     After Experian and Trans Union received Plaintiff's May 2023 Dispute Letter, they violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

156.     As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

157.     The violations by Trans Union, Equifax, and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union, Equifax, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

158.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union, Equifax, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(A) & (B)**
*against Verizon*

159.     Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

160.     Verizon violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after her disputes were furnished to it by Trans Union, Equifax, and Experian.

161.     Verizon violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Trans Union, Equifax, and Experian forwarded Plaintiff's disputes to Verizon.

162.     As a result of Verizon's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation

and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

163.    The violations by Verizon were willful, rendering Verizon liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Verizon was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

164.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Verizon in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT IV:
## VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(C)-(D)
### *against Verizon*

165.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

166.    On one or more occasions within the past two years, by example only and without limitation, Verizon violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the inaccuracies within Plaintiff's credit files with Trans Union, Equifax, and Experian without also including a notation that this debt was still disputed and had not been resolved, by falsely suggesting that the dispute had been resolved, and by failing to correctly report results of an accurate investigation to each credit reporting agency.

167.    Specifically, Verizon failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms when it responded to Trans Union, Equifax, and Experian.

168.    On information and belief, Plaintiff alleges that Verizon rarely if ever adds the XB code or other notation that an account is disputed when it responds to e-Oscar ACDVs.

169.    Verizon knew that Plaintiff previously disputed the subject account on multiple occasions.

170.    Plaintiff's disputes were, at a minimum, *bone fide*.

171.    In fact, Plaintiff's disputes were justified because Plaintiff never owed anything on the 9850 account.

172.    Verizon was aware of the *Saunders v. B.B. & T.* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

173.    On information and belief, Plaintiff alleges that the procedures followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that Verizon intended its employees or agents to follow.

174.    On information and belief, Plaintiff alleges that Verizon's employees or agents did not make a mistake (in the way in which they followed Verizon's procedures) when they received, processed and responded to the Trans Union, Equifax, and Experian ACDVs and did not include the XB code in the CCC field.

175.    On information and belief, Plaintiff alleges that Verizon has not materially changed its FCRA investigation procedures regarding the CCC field in ACDVs after learning of its failures in this case and prior cases.

176.    As a result of Verizon's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation

33

and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

177.   The violations by Verizon were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Verizon was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

178.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Verizon in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT V:
## VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(E)
### *against Verizon*

179.   Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

180.   Defendant Verizon violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from Trans Union, Equifax, and Experian and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Verizon's failure to investigate as articulated herein, after Verizon received notice of Plaintiff's disputes from Trans Union, Equifax, and Experian.

181.   As a result of this conduct (the action and inaction of Verizon), Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment,

headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach

pain, sleep loss, harm to reputation, and loss of privacy.

182.    The violations by Verizon were willful, rendering it liable for punitive damages in

an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Verizon

was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

183.    Plaintiff is entitled to recover actual damages, statutory damages, punitive

damages, costs and attorney's fees from Verizon in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n and §1681o.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of

all issues triable by jury.

### DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Trans

Union, Equifax, Experian, and Verizon;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

**MOLLY VICK**

By:/s/ Adam Wade Short
Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
Adam W. Short, VSB #98844
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Suite 1-A

Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com


By:__/s/ Dale W. Pittman_____
Dale W. Pittman, VSB #15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
112-A W. Tabb Street
Petersburg, VA 23803
Telephone: (804) 861-6000
Facsimile: (804) 861-3368
Email: dale@pittmanlawoffice.com

*Counsel for Plaintiff*